Filed 8/11/25 In re M.R. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.R. et al., Persons Coming Under the Juvenile Court Law. | B336352 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Ch.R.,<br><br>Defendant and Appellant;<br><br>K.G.,<br><br>Intervener and Respondent. | Los Angeles County Super. Ct. Nos. DK19402C, DK19402D |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed and remanded with instructions.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Intervener and Respondent.

The juvenile court took jurisdiction over M.R. and C.R. in 2016 after finding their parents—Ch.R. (father) and M.C. (mother)—engaged in domestic violence in their presence and had unresolved substance abuse issues.  The court removed the children from their parents' custody a year later, and father moved to Las Vegas soon thereafter.  The court terminated father's reunification services in 2018, citing his failure to complete his case plan and visit the children.  Father filed a petition under Welfare and Institutions Code section 388[1] seeking reinstatement of his reunification services and the return of the children to his care.  The court denied the petition without an evidentiary hearing, citing father's failure to maintain consistent visitation.  Father filed three more petitions seeking the same relief, each of which the court denied without an evidentiary hearing.

Father appeals the court's denial of his most recent section 388 petition.  He argues the court was required to conduct an evidentiary hearing because he made a prima facie showing of changed circumstances and the children's best interest.  Father also contends the Los Angeles County Department of Children and Family Services (Department)

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

failed to comply with its duty of initial inquiry under state law (§ 224 et seq.) implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).  The Department does not contest either issue.

We conclude the court did not abuse its discretion by denying father's section 388 petition without an evidentiary hearing, as the record shows father failed to maintain consistent visitation with the children.  However, we accept the Department's concession that its inquiry under ICWA was inadequate.  Accordingly, we affirm the order denying father's petition and remand the matter for further proceedings consistent with ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Background*

Father and mother have two children together, M.R. (born in August 2014) and C.R. (born in July 2015).  Mother has two children from other relationships—Mi.C. (born in 2006) and T.G. (born in 2011)—whom we refer to as the "older siblings."[2]

### 2. *The Department's petitions*

#### a. *The original petition*

The Department filed a petition in September 2016 asserting the children and the older siblings are persons described by section 300, subdivisions (a) and (b)(1).  According to the petition, mother and father engaged in a violent altercation in front of the children.  During the altercation, father allegedly pushed mother to the ground and punched her in the mouth with

---

[2]     This appeal concerns only M.R. and C.R.  Therefore, we summarize facts related to the older siblings only to the extent they are relevant to the issues concerning the younger children.

3

a closed fist. The petition also alleged father was under the influence of marijuana while caring for the children, and mother abused amphetamine, methamphetamine, and marijuana.

The court sustained the petition and declared the children dependents under section 300. As to disposition, the court released the children to the parents' custody under the Department's supervision. The court ordered both parents to complete parenting classes, individual counseling, and drug testing.

b. *The first supplemental petition*

In January 2017, the Department filed a supplemental petition alleging mother had been terminated from a rehabilitation program and failed regularly to submit to drug testing. The court sustained the petition and removed the children from mother's custody. The court placed the children and their older siblings with father.

c. *The second supplemental petition*

The Department filed a second supplemental petition in April 2017. As relevant here, the petition alleged father allowed mother to have unmonitored overnight visitation with the children in violation of the court's order. The court sustained the petition and found the previous disposition had not been effective in protecting the children. The court removed the children and their older siblings from father's custody and terminated the home-of-parent order. The court granted father visitation and ordered him to complete a full drug treatment program, parenting classes, and individual counseling.

4

### 3.    *The reunification period*

In May 2017, the Department placed the children in the home of a non-relative caregiver, K.G. (the caregiver). That same month, father moved to Las Vegas, Nevada. Mother moved to Las Vegas a few months later. Father told the Department he was willing to move back to California if necessary to reunite with the children.

In a January 2018 status review report, the Department recommended the court terminate both parents' reunification services. According to the report, father had missed drug tests and failed to provide documentation verifying his enrollment in parenting classes. Father said he had enrolled in an outpatient drug program in Las Vegas, but the Department had not been able to verify his progress.

The Department reported father's visits had been "sporadic" since the court removed the children from his home. Father said his work and treatment schedules made it difficult for him to travel to see the children in person. He asked the court to continue his reunification services.

The court terminated both parents' reunification services in January 2018 and set a hearing to select a permanent plan under section 366.26. The court found the parents had not complied with their case plans, and "the extent of progress toward alleviating or mitigating the causes necessitating placement by the parents have been non[-]existent." The court explained, "because the parents have relocated out of state, . . . they have not consistently and regularly visited" the children. Moreover, the parents have not made "significant progress in resolving the issues that led to the removal of these children, nor have they demonstrated the appropriateness or ability

5

to complete the objectives of treatment or to provide for the children's safety, protection, physical and emotional well being."

## 4. *Post termination of services*

In April 2018, the Department placed the older siblings in the same home as the children. The next month, the Department reported father's visits continued to be sporadic. Father had not been calling the children on the phone, and his most recent in-person visit was in November 2017. According to the caregiver, father only requested visits "right before each Court hearing."

In July 2018, the Department reported the children were "thriving" in their placement and the caregiver was meeting all their needs. The children and their older siblings had formed an attachment and bond with their caregiver.

In May 2019, the juvenile court selected legal guardianship as the permanent plan. The court appointed the caregiver as the legal guardian of the children and their older siblings. The court granted father monitored visitation.

## 5. *Father's section 388 petitions*

### a. *Father's first petition*

Father filed a section 388 petition in January 2021. The petition asked the court to return the children to father's home or, alternatively, reinstate his reunification services with unmonitored visitation.

According to the petition, father "completed a parenting program, and an outpatient substance abuse treatment program, and has even voluntarily chosen to remain participating in its services. Father receives counseling. Father also submitted to a mental health evaluation as well." The petition asserted father's requested changes would be better for the children

because he was "ready[,] able[,] and willing to provide the children with a safe and nurturing home.  The children would benefit from being raised by their father, who has shown determination in bettering himself for his children."

Father attached to the petition letters and certificates showing he had completed parenting classes and an outpatient substance abuse program.  Father also submitted proof that he voluntarily had chosen to continue receiving substance abuse counseling and had been determined not to need mental health counseling.

The Department prepared a report in response to father's petition.  According to the report, father had not had any in-person visits with the children in three years.  The Department had offered father bus tickets to visit the children, but he said he was too busy with work.

The caregiver reported that father would sporadically video chat with the children, but sometimes he would not contact them for months at a time.  Father told her he was too busy with work and "lost his phone."  The caregiver expressed concern that father often made promises to the children he did not keep, such as promising to send gifts or visit in person.  The children were upset when father did not follow through, and they eventually stopped asking to call or visit him.

Father initially contradicted the caregiver's report, telling the Department he contacted the children every week.  However, upon further questioning, father said he had not been able to contact the children consistently because his "demanding work schedule" conflicted with the times the caregiver was available.  Father said he understood the importance of visitation to

establish a relationship with the children, and he agreed to make a better effort.

The Department recommended the court deny father's petition. The Department noted, although father had completed court-ordered services, "he did not follow or exercise his court[-] ordered visitation" with the children. The Department remarked that the caregiver had been providing the children a stable home, and they were "growing from the love, support, and bonding" she offered to them.

The court denied the petition without a full evidentiary hearing on March 10, 2021. The court found—based on the petition and the Department's report—there had been "no real change [in] circumstances," but, even if there had been, it would not be in the children's best interest "to set a hearing or to grant the motion." The court noted father had not had any in-person visits in three years, had not formed a bond with the children, and continued to reside out of state. Moreover, the children had been in a stable placement for years. The children's counsel agreed with the court's decision.

The court told father it would be "happy to consider" another section 388 petition, but he "need[ed] to step up" first. The court advised father "to visit on a regular basis, even virtually, . . . and develop some relationship" with the children. The court asked rhetorically, if father "does not have time to visit, how does he have time to parent?"

b. *Father's second petition*

Father filed a second section 388 petition in July 2021. Father included in the petition the information from his first petition, plus he asserted he had "maintained consistent

electronic communication with his children since [March 2021]. The children have reported a desire to live with father."

The Department prepared a report and recommended that the court deny father's petition. According to the report, father consistently called the children on a weekly basis between March and August 2021. However, he had not had any in-person visits and could not identify any barriers preventing him from doing so. The Department recommended that father improve visitation and participate in therapy with the children.

The court considered the petition at a hearing in September 2021. Once again, the court found there were no changed circumstances and father's requested relief would not be in the children's best interest. Accordingly, the court denied the petition without a full evidentiary hearing.

c.      *Father's third petition*

At a July 2022 permanency planning review hearing, father told the court he had been trying to call the children more often, but the caregiver would not answer the phone. The court pointed to a recent status report, in which the Department stated father had been calling at inconvenient times and did not answer the phone when the caregiver called back. The court told father to "work on . . . answering the phone when the kids call or setting up a schedule . . . so that everybody knows." The court directed the Department to work with father and the caregiver to set up a visitation schedule.

About a month later, in August 2022, Father filed a third section 388 petition. Father included the same information from his first two petitions, plus he asserted he "resides in Las Vegas and has made best attempts to stay in contact with the children, but the caregiver has not been cooperative in answering the

telephone for visits." The court summarily denied the petition because father did not provide new evidence or state a change in circumstances.

> d.      *Father's fourth petition*

Father filed a fourth section 388 petition in December 2023, again asking the court to return the children to his home or reinstate reunification services with unmonitored visitation. Father attached to the petition the same documents he attached to his first three section 388 petitions.

As grounds for the proposed changes, father repeated many of the same assertions he made in his first three petitions. His fourth petition stated the following:  "The children have recently expressed a desire to return to father.  Father had previously completed [his] caseplan—a parenting program, and an outpatient treatment program.  Father received counseling and submitted to a mental health evaluation as well. . . . Father resides in Las Vegas and has made best attempts to stay in contact with the children, and reportedly has seen the children in person [i]n July 2023.  He reports staying in contact with them via telephone."  Father asserted his requested changes would be better for the children because he "is able to provide a safe home for the children, and they have expressed a desire to return home to him."

> e.      *The Department's report*

The court set a hearing to consider whether to conduct an evidentiary hearing on father's fourth petition, and it directed the Department to prepare a report.  The Department produced a 27-page report recommending the court reinstate father's reunification services.  The Department included the following information in the report:

10

*Visitation.*  Father told the Department he moved to Las Vegas shortly after the children were removed from his care because he "needed to better myself to get my kids."  Father had been living in Las Vegas with his wife and her 16-year-old daughter from a prior relationship.

According to father, he frequently visited M.R. and C.R. in 2017 and 2018.  He would take a bus from Nevada to meet up with the caregiver and the children.  However, his finances changed in 2019 and he could no longer afford to make the trip.[3]  Father planned to schedule in-person visits once he had a reliable vehicle.  His finances were tight because he has three other children who also live in Los Angeles, and he pays child support for two of them.

Father acknowledged he had not had regular contact with the children since late 2021 or early 2022.  According to father, he used to call the children regularly and talk to them for hours.  At some point, the caregiver stopped answering his calls, so he stopped calling and sought relief from the court instead.

 The caregiver said father typically called the children only on birthdays and holidays.  She tried her best to answer his phone calls.  If she missed a call, she would send father a message and try to reschedule.  Father called C.R. on his birthday, but C.R. was busy with his party and did not want to talk on the phone.

The caregiver said father continued to make promises to the children he did not keep.  He told the children he would "pick them up to live with him or send them presents," but he

---

[3]     The Department noted it offered father transportation from Nevada to visit the children.

11

never did.  Father once told the children he could not visit them because the roads were closed.  The children were confused when they discovered other people had traveled to or from Las Vegas.

M.R. said she talked to father during holidays and once saw him on a video call.  C.R. also said he talked to father, but he could not say how often.  He recalled seeing father on a video call three years earlier.

The caregiver said she took the children on a weekend trip to Las Vegas in July 2023.  The purpose of the trip was to visit the children's parents.  The caregiver told father about the trip, and father said he was going to see the children as soon as they arrived.  The children arrived on a Friday, but father said he could not see them until Saturday.  On Saturday, father said the children were too far away for him to travel.  Father finally met up with the children on Sunday at the Circus Circus casino.  Father interacted lovingly with the children during the visit, but the children spent most of the time on rides.  Father left after an hour.

Father said the caregiver told him about the Las Vegas trip "last minute."  He wanted to see the children for longer, but he had just started a new job and could not get time off work.

Father told the Department he and his wife had a two-hour video visit with the children in January 2024.  The children had not known father was married.  Father said the visit went well and he was working with the caregiver to set up regular video visits.  However, they still had scheduling conflicts to resolve.

The Department monitored a video visit with father in February 2024.  According to the Department, father engaged the children in conversation, the children responded well to him, and they appeared comfortable and happy.

*The children's preferences.*  M.R. told the Department she misses father, wants to visit him more often, and wants to live with him in Las Vegas.  She said father is "nice, he says hello to me, and he gives me kisses.  He tells me he loves me so much and he will try to see me more when he doesn't have to work."  M.R. felt safe with father and was happy when they talked.

M.R. said she likes living with the caregiver and referred to her as "mommy" and "auntie."  M.R. did not want to leave her older siblings, and she started to cry at the thought of being separated from them.

C.R. said he wanted to live with father "because he fries chicken. . . .  If I live with him he can give me some of his chicken.  Maybe he can take me to Circus Circus too."  C.R. was happy when he saw father in Las Vegas, but father had to leave early to go to work.

*The children's needs.*  The Department reported the children have significant developmental and behavioral issues, and a disruption to their care could have negative consequences to them.  Both children had been diagnosed with Autism Spectrum Disorder (ASD) and Attention Deficit Hyperactivity Disorder (ADHD).  C.R. also had been diagnosed with a neurodevelopmental disorder associated with fetal alcohol exposure.  The children participated in special education classes, individual therapy, mental health services, and tutoring.

According to the Department, the caregiver consistently met the children's needs.  She provided a stable and safe living environment for the children, and they were thriving under her care.  The caregiver was committed to providing a permanent home for the children and their older siblings.  She had recently

13

discussed adoption with the children, and they were excited by the idea.

Mother told the Department she would love for the children to live closer to her in Las Vegas, but their home is with the caregiver. She said the caregiver is a good person who taught the children respect and values. Mother did not want the children to be separated from the older siblings.

*The Department's recommendation.* The Department recommended the court grant father's petition in part. The Department noted it was concerned about father's lack of visitation and ability to care for the children. However, he had taken steps towards addressing his case plan and had been "persistent in regaining custody" of the children. The Department recommended the court reinstate father's reunification services for six months. It recommended against returning the children to his home.

f.      *The hearing*

The court denied father's petition at a hearing on March 26, 2024. The court stated, "having read and reviewed the [section] 388 [petition], the Department's documents[,] and hearing from minors' counsel, the court, at this time, is going to deny the [petition] without a[n evidentiary] hearing, finding there is no change in circumstances. Assuming arguendo, there was a change in circumstance[s], the court finds that it's not in the best interest of these children to provide reunification services to their father." The court asked, "Does anybody wish to be heard?" Father "object[ed] to the summary denial" of his petition, but he did not offer substantive argument.

14

After denying father's petition, the court directed the Department to give notice that the caregiver had asked to change the permanent plan to adoption.

Father timely appealed the denial of his petition.

## DISCUSSION

### 1. *The court did not abuse its discretion by denying father's petition without an evidentiary hearing*

Father argues the juvenile court erred by summarily denying his fourth section 388 petition. According to father, his petition established a prima facie showing of changed circumstances and that his requested relief would be in the children's best interest. Therefore, father argues, the court should have conducted a full evidentiary hearing before ruling on the petition.

#### a. *Standard of review and relevant law*

Section 388 allows a parent of a dependent child to petition the juvenile court to change, modify, or set aside its prior orders. (§ 388, subd. (a)(1).) The parent has the burden to prove, by a preponderance of the evidence, (1) the existence of new evidence or changed circumstances justifying a change in the juvenile court's prior orders, and (2) the proposed change would promote the best interests of the child. (*In re A.A.* (2012) 203 Cal.App.4th 597, 611; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1216–1217.)

Under rule 5.570 of the California Rules of Court, a court has four options upon receiving a petition under section 388. The court may (1) deny the petition ex parte (*id.*, rule 5.570(d)); (2) grant the petition without a hearing if all parties stipulate (*id.*, rule 5.570(f)); (3) "order a hearing for the parties to argue whether an evidentiary hearing on the petition should be granted

15

or denied" (*id.*, rule 5.570(f)(2)); or (4) order an evidentiary hearing (*id.*, rule 5.570(f)(1)). At an evidentiary hearing, "proof may be by declaration and other documentary evidence, or by testimony, or both, at the discretion of the court." (*Id.*, rule 5.570(h)(2).)

The court must order an evidentiary hearing only " 'if the liberally construed allegations of the petition . . . make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child . . . . The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) The juvenile court may consider the entire factual and procedural history of the case in deciding whether a petition makes the required prima facie showing. (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) We review a juvenile court's decision to deny a section 388 petition without a full evidentiary hearing for an abuse of discretion. (*Ibid.*)

     b.    *Father did not make a prima facie showing of changed circumstances*

"Not every change in circumstance can justify modification of a prior order. The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.) A "showing of changing circumstances is not sufficient to require a hearing on the merits of [a] section 388 petition." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

Contrary to father's contentions, the juvenile court did not abuse its discretion by concluding he failed to make a prima facie

showing of changed circumstances.  Father identified five changed circumstances in his fourth petition:  (1) father completed all the services required under his case plan; (2) he visited the children in person in July 2023; (3) he "stay[ed] in contact with [the children] via telephone"; (4) he made his "best attempts" to stay in contact with the children; and (5) the children expressed a desire to live with him.

Father's completion of services was the most significant changed circumstance he identified, but the court reasonably could have determined it was not sufficient to warrant the relief he sought.  The court gave two primary reasons for terminating father's services and removing the children from his care: (1) father failed to complete the services required under his case plan; and (2) father failed consistently to visit the children. Father's completion of services addressed only one of those concerns, which the court made clear when it denied father's first section 388 petition in March 2021.  The court plainly stated it would not change its prior orders unless father "visit[ed] on a regular basis, even virtually, . . . and develop[ed] some relationship" with the children.

The juvenile court reasonably could have concluded none of the other changed circumstances father identified resolved the visitation issue.  Father asserted he visited the children in person in July 2023 and "stay[ed] in contact with them via telephone." However, it is undisputed that the July 2023 visit lasted one hour, and it was father's only in-person visit with the children in at least five years.  Although father talked to the children over the phone more often, he admitted he had not called them regularly since late 2021 or early 2022.  The court did not abuse its discretion to the extent it concluded a one-hour in-person visit

17

and sporadic phone calls did not constitute sufficiently changed circumstances.

The same is true of father's assertion that he made his "best attempts" to stay in contact with the children. Father has given various explanations for his lack of consistent visitation over the years, including his work schedule, a lack of transportation, his physical distance from the children, and the caregiver's refusal to answer his calls. There is ample evidence in the record refuting many of those assertions. However, even assuming they were true, it does not change the fact that father had not established or maintained consistent visitation with the children. In other words, father's "best attempts" to stay in contact with the children had not resolved one of the primary reasons the court terminated his reunification services and removed the children from his care.

Nor was it sufficient for father to assert the children had "recently expressed a desire to return to" his home. The court did not rely on the children's preferences when it terminated father's reunification services and removed them from his care. Nor did the children's desire to live with father otherwise resolve the issues that led the court to issue those orders. Thus, the court could have reasonably concluded the children's desire to live with father—even if true—did not warrant granting father's requested relief. Accordingly, the court did not abuse its discretion by concluding father failed to establish a prima facie showing of changed circumstances and denying his petition without an evidentiary hearing.

c.    *Father did not make a prima facie showing of the children's best interest*

Even if father had made a prima facie showing of changed circumstances, the court reasonably could have determined he failed to demonstrate his proposed changes were in the children's best interest.

Where, as here, reunification services have been terminated, "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Thus, "after reunification services have terminated, a parent's [section 388] petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

Here, father's proposed changes threatened to upend the permanency and stability the caregiver had provided the children for the majority of their lives. When the court considered father's fourth petition, the children had been living with the caregiver for more than six years. The children had formed a deep bond to the caregiver during that time, referring to her as "mommy" and "auntie."

According to the Department, the caregiver provided the children a safe and stable environment, and they were thriving under her care. The children had significant needs, including diagnoses for ASD, ADHD, and a disorder related to fetal alcohol exposure. The Department reported the caregiver ensured the

19

children received services to address all of their needs, and a disruption to those services could have negative consequences.

The caregiver also was committed to providing the children a permanent home and family unit. She was the legal guardian for the children and their older siblings. She also was working towards adopting the children, a prospect they seemed to welcome.

Father suggested two reasons why his requested relief would be in the children's best interest, but the juvenile court reasonably could have found neither warranted the disruption to the children's current placement. First, father asserted he was "able to provide a safe home." However, it was undisputed the caregiver was already providing the children a safe home. Therefore, the fact that father also could provide a safe home was not enough to overcome the presumption in favor of the children's current placement.

The only other reason father gave for granting his petition was that the children had "expressed a desire to return home to him." "While a child's wishes are not determinative of her best interests, the child's testimony that she wants to live with her [parent] constitutes powerful demonstrative evidence that it would be in her best interest to allow her to do so." (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.)

The Department's report supports father's assertion that the children wanted to live with him. However, the court could have reasonably discounted the children's wishes given their ages and extremely limited contact with father. The court removed C.R. and M.R. from father in 2017, when they were approaching two and three years old, respectively. The children visited father a handful of times over the next two years. In the five years after

that, however, they had a single in-person visit with father, which lasted one hour. As of March 2024—when the court considered father's fourth petition—the children had never been to father's home in Las Vegas, let alone spent meaningful time in it. Nor had they met in-person father's wife and step-daughter, with whom he lived. In fact, until January 2024, the children did not even know father was married. Under these circumstances, it would have been impossible for the children to make an informed decision about whether to return to father's care.

On this record, the court reasonably could have concluded the children's stated desire to live with father did not warrant disrupting the stability and permanency they had in their current placement. The court did not abuse its discretion in determining father failed to establish a prima facie showing that granting his petition would serve the children's best interest. Accordingly, it did not err by denying father's petition without conducting a full evidentiary hearing.

Father suggests the court should have deferred to the Department's conclusion that granting his petition would serve the children's best interest. According to father, the Department "engaged in [a] thorough analysis and agreed it was in the children's best interest to increase [his] visitation with the children and to reinstate [his] reunification services."

Contrary to father's contentions, the court could have reasonably rejected the Department's analysis and conclusion. As father notes, the Department conducted a thorough and detailed analysis in its report. However, the analysis it performed concerned the parental-benefit exception to the termination of parental rights, an issue that was not before

21

the court. Therefore, many of the factors the Department considered were simply not relevant to father's petitions.[4] On the issues that were before the court—whether to reinstate father's reunification services or return the children to his care— the court did not abuse its discretion in determining father failed to make a prima facie showing that his proposed changes would serve the children's best interest.

d. *Father has not shown prejudice*

Even if father had established a prima facie case for relief, he has not shown the court's failure to hold an evidentiary hearing was prejudicial. A failure to conduct an evidentiary hearing on a section 388 petition is prejudicial if " ' " 'there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' " ' " (*In re J.P.* (2014) 229 Cal.App.4th 108, 128.)

Although the court did not conduct a full evidentiary hearing, it is somewhat misleading to characterize its denial of father's petition as "summary." After reviewing father's petition, the court set a hearing to decide whether to conduct a full evidentiary hearing. (See Cal. Rules of Court, rule 5.570(f)(2).) At the same time, the court ordered the Department to submit a report responding to the petition. To prepare the report, the Department interviewed father, mother, the caregiver, the children, and several social workers who had worked with the family. The Department summarized those interviews— along with other relevant information it had collected over the course of eight years—in a 27-page report. After reviewing

---

[4] As one example, the Department considered "[w]hether the harm of severing the parent-child relationship . . . outweighs the security and finality adoption would confer."

the Department's report and giving the parties an opportunity to present argument, the court declined to set an evidentiary hearing and denied father's petition.

*In re C.J.W.* (2007) 157 Cal.App.4th 1075 (*C.J.W.*) involved a similar procedure. In that case, the parents argued the juvenile court violated due process by summarily denying their section 388 petitions without a full evidentiary hearing. (See *id*. at pp. 1079–1081.) The appellate court rejected the parents' arguments—including their assertion that the court summarily denied their petitions—explaining, "[w]hat ultimately occurred is the [juvenile] court did conduct a hearing but did not allow testimony from the parents on the section 388 petitions. The court, however, did receive written evidence and heard substantial argument from counsel for the parties." (*Id*. at pp. 1080–1081.) The appellate court held this procedure comported with due process, noting the parents did not "identify what further evidence they wanted to present" at a full evidentiary hearing. (*Id*. at p. 1081.) The court also suggested any error was harmless because it was "not reasonably likely additional testimony would have persuaded the court to grant the section 388 petitions." (*Ibid*., citing *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 (*Edward H.*))

Here, as in *C.J.W.*, the court denied father's petition after conducting a limited hearing, receiving written evidence, and allowing the parties to present argument. Like the parents in *C.J.W.*, father does not identify any additional evidence he could have produced at a full evidentiary hearing. Nor does he challenge any of the information in the Department's report or identify significant contested issues of fact in it. To the contrary, father relies heavily on the Department's report to support his

23

arguments on appeal. The court, however, already considered the report and determined it does not warrant reinstating father's services or returning the children to his care. Apart from a conclusory assertion that he could have addressed the court's questions and concerns, father suggests no reason why a full evidentiary hearing might have caused the court to reach a different conclusion.

Under these circumstances, there is not a reasonable probability that a full evidentiary hearing would have resulted in a different outcome. Accordingly, father has not shown the court's denial of his petition without a full evidentiary hearing was prejudicial. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1164–1165 [failure to conduct an evidentiary hearing on a section 388 petition was harmless where the mother "wholly fail[ed] to identify additional evidence she would have presented at an evidentiary hearing that would have established a right to reunification services"]; *Edward H., supra*, 43 Cal.App.4th at p. 594 [failure to hold an evidentiary hearing on a section 388 petition was harmless where "nothing would have been gained had the cause gone to a full hearing"]; *C.J.W., supra*, 157 Cal.App.4th at p. 1081.)

**2.** ***Limited remand is warranted for the Department and the court to comply with ICWA***

Father contends the case must be remanded for the Department and the court to conduct a more thorough ICWA inquiry.

Under California law implementing ICWA, the juvenile court and the Department "have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an

24

Indian child." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1131–1132, quoting § 224.2, subd. (a).) The duty "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); former § 224.1, subd. (c) [adopting federal definition].) Once the juvenile court or the Department has a "reason to know" an Indian child is involved, formal notice under ICWA must be given to the child's "parents or legal guardian, Indian custodian, if any, and the child's tribe." (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).)

In September 2016, the juvenile court found ICWA does not apply based on the parents' reports. The Department performed a more thorough ICWA inquiry in January 2024. During that investigation, mother, father's wife, a paternal aunt, and the caregiver denied having relevant information about the children's Indian ancestry. Father also denied that he has any Indian ancestry. However, he told the Department he believed mother may have Indian ancestry from the Louisiana area.

Father contends the Department's ICWA inquiry was inadequate. He notes the Department did not specifically question mother about possible Indian ancestry from Louisiana. Father also notes the Department asked only one of his 11 siblings, and none of mother's relatives, about possible Indian Ancestry.

25

The Department filed a letter brief conceding "a more thorough inquiry of available relatives is warranted."  We accept the Department's concession and remand the case with directions to conduct a more thorough ICWA inquiry.

## DISPOSITION

We affirm the order denying father's section 388 petition. We remand the matter to the juvenile court to ensure the Department complies with the inquiry and—if applicable—notice provisions of sections 224.2 and 224.3, and properly documents its efforts.  If the juvenile court determines ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions.  (See 25 U.S.C. § 1912(a); §§ 224.2, subd. (i)(1), 224.3, 224.4.)


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.